IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 13, 2018 Session

FILED
06/25/2018
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. MARTAVIOUS D. BROOKS AND BRITTANY G. LEE

**Appeal from the Circuit Court for Montgomery County
Nos. CC-2015-CR-678 & CC-2015-CR-615       Jill Bartee Ayers, Judge**

_____

### No. M2017-00505-CCA-R3-CD
_____

A Montgomery County jury convicted the Defendants, Martavious D. Brooks and Brittany G. Lee, of theft of property valued over $10,000, and it also convicted Defendant Lee of aggravated robbery.  The trial court sentenced Defendant Brooks as a Range II, multiple offender to ten years in prison.  The trial court merged Defendant Lee's convictions and sentenced her to nine years in prison, at 85%, for the aggravated robbery conviction.  On appeal, Defendant Lee contends that the evidence is insufficient to sustain her convictions and that the trial court improperly limited her cross-examination of a witness.  Defendant Brooks contends that the evidence is insufficient to sustain his conviction for theft.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Robert Allan Thompson, Clarksville, Tennessee, for the appellant, Martavious D. Brooks.

James Andrew Simmons and Jamie Simmons Tarkington (on appeal), Hendersonville, Tennessee, Larry B. Hoover, Nashville, Tennessee (at trial) for the appellant Brittany G. Lee.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; John W. Carney, Jr., District Attorney General; and Daniel A. Stephenson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the theft of a diamond ring from a ninety-year-old woman living in an assisted living facility on September 28, 2014. For this theft, a Montgomery County grand jury indicted Defendant Lee, who was an employee of the assisted living facility, and her husband Defendant Brooks, for aggravated robbery, theft of property valued over $10,000, especially aggravated burglary, and criminal responsibility for especially aggravated burglary. At a trial on these charges, the parties presented the following evidence: Delbert L. Peterson testified that his mother, Christine A. Peterson, resided in Sterling House, an assisted living facility in Clarksville, Tennessee. On September 28, 2014, while his mother was residing at the facility, the Clarksville Police Department called him at around 11:15 p.m. and informed him that his mother had been assaulted. He went to Gateway Hospital, where she had been taken, to be with her. Mr. Peterson identified photographs showing that his mother had bruising and other injuries from being beaten. Mr. Peterson testified that his mother had a "broken orbit" among other injuries.

When Mr. Peterson arrived at the hospital, his mother said that she did not understand why someone would have injured her for her ring. The diamond ring about which she was talking was a family heirloom, bequeathed to her some forty-five years prior by her sister. Mr. Peterson testified that his mother wore the ring "constantly." Mr. Peterson identified an appraisal from 2009 for the ring, which found its replacement value to be $10,000.

During cross-examination, Mr. Peterson said that he did not know the story behind where his aunt originally got the ring.

Thomas Teague testified that he performed the appraisal of the victim's diamond ring in 2009 when he worked for MacKenzie and Smiley Jewelers. He said that his appraisal described the ring as 14-carat yellow gold, diamond solitaire with an approximately 1.5 carat round brilliant diamond with a clarity of SI 2 and a color of H. The appraisal estimated the replacement value for the ring at $10,000. The appraisal included a photograph of the ring.

Michael Curtsinger, an emergency medical technician with the Montgomery County EMS, testified that he responded to the call about a suspected fall at Sterling House. When he arrived, he found the victim, Ms. Petersen, with swelling and a laceration to the side of her face. Mr. Curtsinger identified photographs of the victim taken on the night of the incident.

Mr. Curtsinger found it strange that there was blood only on the victim's bed and pillowcase and nowhere else in the room. He said that, had the victim fallen, he would have expected to see blood in other locations. The victim told him that night that she had

awoken to someone standing over her and that they had struck her in the face. Mr. Curtsinger began the process to transport the victim to the hospital, and she felt her finger and said that her ring was missing. Mr. Curtsinger noted a small tear on the side of the victim's finger. On their way to the ambulance, the victim asked if her son had been contacted, and Mr. Curtsinger's partner went with the victim while Mr. Curtsinger contacted the Clarksville Police Department and also asked Sterling staff if they had contacted the victim's son.

During cross-examination, Mr. Curtsinger agreed that two African-American females were on duty on the night of this incident. He agreed that it was not unusual for EMS to receive calls about elderly people who had fallen. On redirect examination, he said that this was unlike his other fall calls in that there was no blood on anything except the victim's bed.

A second EMS responder, Rita Cain, testified that she was dispatched to respond to this call from the nursing home, where she found the victim in the bathroom sitting on the commode. The victim's eye was swelling, and she said that someone had hit her. Ms. Cain said that she looked around the room and saw no signs of blood anywhere but on the bed. Ms. Cain said that she had responded to several calls about elderly persons falling and usually there was blood in the location where they had fallen.

Ms. Cain said that she placed the victim on a stretcher and put her in the ambulance. During the ambulance ride, the victim said that she had a ring missing, and Ms. Cain observed a skin tear on the victim's finger from which the ring was missing.

During cross-examination, Ms. Cain said that there were no blood specks between the bed and the bathroom, and she could not explain why, if the victim went from the bed to the bathroom, there was no blood trail. Ms. Cain said that the victim's facial wounds had stopped bleeding by the time the ambulance arrived. She further clarified that there was one staff member in the bathroom helping to care for the victim when she arrived.

Jackie Stevens testified that she was initially charged as a co-defendant in this case. Ms. Stevens said that at the time of this incident she worked at Sterling House, and she arrived for work at 3:00 p.m. on that day for her 3:00-11:00 p.m. shift. Ms. Stevens said that Defendant Lee arrived for work later and that at 10:00 p.m. it was just the two of them working. Ms. Stevens testified that the building was kept locked and required a code for entry. The doors sounded an alarm if someone entered without the code. The patients' rooms were also kept locked, and employees could gain access to those rooms only with a key. Ms. Stevens said that she checked on the residents before leaving at 11:00 p.m., and the victim was sleeping in her bed. Ms. Stevens said that the victim's door was locked when she checked on her and locked when she left the room.

3

Ms. Stevens said that, after checking on her patients, she went to the front lobby and began folding napkins. Defendant Lee left the front lobby and went in the direction of the victim's room, saying she was going to get clothes hangers. Ms. Stevens said that, at the end of that hall, there was an exit, which Ms. Stevens had never used. Ms. Stevens said that shortly after Defendant Lee returned, the victim's alarm sounded, and she cried for help. Ms. Stevens arrived at the victim's room first, and she unlocked it and saw blood on the pillows. The victim was sitting on the toilet, her face swollen, and blood "all on her face."

Ms. Stevens testified that Defendant Lee entered the room but not the bathroom. Defendant Lee did not offer any assistance, but she did call 911. The victim repeatedly said that someone had "beat her up." When EMS responded, they cared for the victim and then told Ms. Stevens that the victim said she had a ring missing. Ms. Stevens told Defendant Lee to tell "Debbie," the executive director of Sterling House, that the victim mentioned a missing ring. Defendant Lee did not comply with this request, and Ms. Stevens informed "Debbie" that the ring was missing.

During cross-examination, Ms. Stevens testified that she had been employed less than six months at the time of these events. She said that she did not know why the pillowcase had been removed from the pillow but stated that she did not remove it. Ms. Stevens said that Defendant Lee did not call 911 the first time Ms. Stevens asked her to do so and instead called Deborah ("Debbie") Elms.

Upon further questioning, Ms. Stevens said that one of her Alzheimer's patients was with her that evening, following her around. Ms. Stevens explained that the patient did not like to sleep and kept trying to walk out the door. The patient was sitting in the lobby in a chair when the victim called for help. Ms. Stevens said that, at the time of trial, she had been in the nursing home care industry for seven years and had never had a patient have personal belongings go missing.

Bambi Boyd, also an employee of Sterling House at the time of these events, testified that she was the health and wellness director, meaning that she supervised the nurses and the resident care associates. She described the resident care associates position, saying that they would serve residents their meals, dress and bathe them, wash their clothes, and check on them every two hours, among other things.

Ms. Boyd described Sterling House as a secure facility, saying that each of the doors has a key pad and that only employees have the code to the doors. Further, the front door had restricted access, meaning that a visitor had to ring a bell before entering. At the time when the victim was injured, a visitor would have had to ring the doorbell, go

to a phone system and speak with a staff member, who could then let them into the building.

Ms. Boyd said that she was "[v]ery acquainted" with the victim, whom had resided at Sterling House all nine years that Ms. Boyd had been employed there. The two spoke on a regular basis and had a "really good relationship." The victim could accurately recognize and name Ms. Boyd's children when they came to visit.

Ms. Boyd said that she responded to Sterling House on the night of this incident. She said that Defendant Lee called her between 10:30 and 10:45 p.m. saying that the victim had pulled a cord indicating that she needed help and that, when Defendant Lee responded, the victim had blood all over her face and her eye was swollen. Ms. Boyd said that she informed Defendant Lee that the victim's injury qualified as a head injury and that 911 needed to be called. She also informed Defendant Lee that the victim's son needed to be called. Ms. Boyd said, at this point, Defendant Lee told Ms. Boyd that the victim was saying that someone beat her up. Ms. Boyd said she was confused and asked if there were any other residents awake and whether the victim's room was locked.

Ms. Boyd said that she went to Sterling House and looked in the victim's room. She noted that there were two pillowcases "pretty saturated with blood" but that there was not much in disarray. They searched the apartment numerous times but did not see any blood anywhere but the bed. Ms. Boyd testified that, normally, there would have been a pool of blood wherever the victim had fallen, if she had fallen.

During cross-examination, Ms. Boyd said that after she learned that the victim had said that someone had beat her up, Ms. Boyd called Deborah Elms, the executive director of Sterling House.

Deborah Elms, the executive director of Sterling House at the time of these events, testified that the victim had been a resident at Sterling House for ten years. She described her relationship with the victim as "[v]ery friendly" saying that the two were social with one another and spoke several times a day. Ms. Elms recounted that the victim got the ring at issue while she was a resident at Sterling House. Initially, the victim's family asked Ms. Elms to keep the ring locked up, but then they told her to allow the victim to wear it as she desired. The victim wore the ring every day, and it had never before gone missing.

Ms. Elms said that when Ms. Boyd called her about the incident between 10:00 and 11:00 p.m. she immediately responded to Sterling House. The victim was in the ambulance when she arrived. Ms. Elms said that she went to the victim's room, where she noted there was a lot of blood on the bed. Ms. Elms went to call police, but they

5

arrived before she placed the call. Ms. Elms said that she went back to search the room but found no other signs of blood or that the victim had fallen. The victim's son, Lee Peterson and his wife, both arrived, and they all looked together for the ring but were unable to locate it.

Ms. Elms testified that there was an exterior door near the victim's room. That door could be opened from the inside with a code, which employees had, which would disengage it from the alarm system. Ms. Elms said that there was also an exterior door inside the victim's room, which led to a "[s]ecure courtyard." There was no exit from the courtyard.

During cross-examination, Ms. Elms testified that a plumber was called to ensure that the ring was not in the toilet or the sink. The plumber did not find the ring.

Christine Peterson testified that she was ninety-two years old on the day of trial and living in Clarksville. The victim recalled that someone took her ring. She said that the person who took her ring put a pillow over her head, and she asked them to stop because she could not breathe.

Rachel Root, an emergency medical physician at Gateway Medical Center, testified that she treated the victim for her injuries related to this case. Dr. Root testified that the victim told her at the time of treatment that someone had come into her room, struck her in the head, and stolen her ring. Dr. Root said the victim suffered "a lot of facial trauma" and looked uncomfortable, but Dr. Root described her as "tough" and "kind of spunky." Dr. Root said that, reviewing the victim's file, she discovered that the victim had been diagnosed with dementia and was on several medications, but she was alert and oriented that night.

Dr. Root testified that the victim was on Coumadin the night of the alleged attack. She said that Coumadin was a blood thinner and that one would expect to see blood at the location of a fall, had the victim fallen.

Dr. Root testified that her examination of the victim revealed that she had suffered a "significant facial fracture" to the bottom part of her eye socket. The orbital floor was fractured, and a piece of that was depressed down almost a centimeter. This caused Dr. Root concern that one of the victim's eye muscles would get trapped or snagged on the fracture fragment. This might cause the victim double vision. The victim also had a small blood clot and bleeding around the fracture site, which could have impaired her vision. Based upon her examination, Dr. Root admitted the victim to watch her injuries further. Dr. Root testified that the victim was "very bruised" and had "a lot of facial trauma". She described her as "very uncomfortable and in pain." Dr. Root testified that

6

she admitted the victim into the hospital to repeat a CT scan to check for delayed brain bleeding, based in part on her being on blood thinners. Dr. Root testified that brain bleeding is a potentially fatal condition.

During cross-examination, Dr. Root testified that the victim was also taking aspirin, which had blood thinning properties. Additionally, the victim took Bethanechol, Lorazepam, and a cough medicine, which could also sometimes cause dizziness and light-headedness. Dr. Root said that the victim was also taking other medications for which Dr. Root was unsure of the side effects. Dr. Root said that, while the victim had been prescribed these medications, she was unsure whether the victim had taken all of them on the night in question.

Dr. Root agreed that patients with dementia had intermittent times of clarity and confusion. Dr. Root agreed that she was informed that the victim had previously hidden jewelry in her vagina, so Dr. Root ordered a pelvic X-ray to exclude that the missing ring was inside the victim. Dr. Root also said that her "differential diagnosis" included that the victim's injuries may have been caused by a fall, but it also stated that the injuries did not look consistent with tripping and falling. Once Dr. Root learned from EMS that there was blood on the victim's pillow but nowhere else in the room, she ruled out falling as the cause of the injuries.

During further cross-examination, Dr. Root testified that the victim presented with clear speech, consistent answers to questions, entirely normal coordination, and normal motor and sensory function. She conceded that she did not see the victim stand and walk, in part because the victim suffered a head injury, and it would not be prudent to have her standing and walking.

Lisa Reed, a Clarksville Police Department ("CPD") officer, testified that she responded to the call about the victim being robbed. She arrived at Gateway Medical Center and spoke with the victim, whom she found lucid and honest. The victim told her that her ring was missing, and Officer Reed noted that there was a tear on the finger from which the ring was allegedly taken.

Chastin Lanham, an officer with the CPD, testified that Officer Reed contacted him and told him that he should go to Sterling House and investigate the ambulance call further. When he arrived, he was granted entrance by Defendant Lee, who took him to see Ms. Elms. Officer Lanham went to the victim's room, where he saw blood "covering the bed." He found bloody napkins in the trashcan and debris in the toilet. Officer Lanham said that the pillowcase had been taken off the pillow and thrown back on the bed. Officer Lanham said that he asked Defendant Lee if she had called 911, and she said she had not. When he later confronted her about this, she admitted that she had

called 911 but that she had forgotten doing so.

Roger Harjani testified that he owned a jewelry store in Roswell, Georgia named Meridian Diamond Company. He described it as a "typical jewelry store" but stated that the store also bought and sold preowned jewelry. Mr. Harjani said that on October 2, 2014, four days after the alleged assault, he purchased a diamond, and he identified the documentation for the purchase. The documentation showed that he purchased the diamond from Defendant Brooks, whom he identified in court. Mr. Harjani offered a scan of the identification he took from Defendant Brooks at the time of the purchase, and the photograph on the identification matched Defendant Brooks. Mr. Harjani said Defendant Brooks listed his phone number as a number ending in -0633. Mr. Harjani offered a picture from his video camera surveillance showing Defendant Brooks in his store on October 2, 2014. He also offered photographs of the diamond that he purchased from Defendant Brooks.

Mr. Harjani testified he compared the diamond with a master set for color to gage the color quality of the diamond. After a brief examination, Mr. Harjani determined that the diamond was between "H" and "N" in color. Mr. Harjani and the Defendant negotiated the purchase price of the diamond and settled at $2100. Mr. Harjani said that the Roswell Police Department ultimately took possession of the diamond.

During cross-examination, Mr. Harjani testified that he was not suspicious of the transaction and had no reason to believe that Defendant Brooks's identification or phone number were false. He agreed that the diamond was more yellow in color and he thought that it was more of an "M" or an "N" in color.

During redirect examination, Mr. Harjani testified that he asked Defendant Brooks why he had a loose diamond, and Defendant Brooks told him that it was from a previous marriage and that he did not need it anymore.

During further cross-examination, Mr. Harjani said that he often purchased diamonds from previous marriages.

Karen Milbrodt testified that she was a records custodian for Verizon Wireless. She produced a six-page document, admitted into evidence, which she had printed in response to a subpoena for a phone number ending in -9331. The phone bill showed the billing address to be Apartment F located at 530 Hietts Lane in Clarksville, Tennessee. Ms. Milbrodt explained that a six or "6" next to a number indicated that it was an incoming call, and a 3 indicated an outgoing call. An F indicated that the call was forwarded, likely to voicemail.

Channing Bartel, a detective with the CPD, testified that he was the lead detective in this case. He received a call at 1:05 a.m. informing him about a likely fall at Sterling House, so he arrived there around 1:30 a.m. to begin his investigation. After speaking with a responding officer, Ms. Boyd and Ms. Elms, Detective Bartel went to the victim's room and conducted a visual inspection and took a few pictures. Detective Bartel said that he noticed a "considerable" amount of blood in the bed, one of the pillows he described as "soaked," but he did not see anything else disturbed in the bedroom. Detective Bartel testified that he was originally informed that the victim may have hit her head on the nightstand, but he said that nothing was knocked over on the nightstand, making that seem unlikely. During his investigation at Sterling House, Detective Bartel determined it was approximately a forty-second walk from the station where the two employees said that they were located to the victim's room.

Detective Bartel testified that he learned that there were only two people present during the time frame when the victim was hurt. He also learned that the residents were able to lock themselves into their rooms and that the two employees present, Defendant Lee and Ms. Stevens, had keys to the rooms in order to check on the residents. Detective Bartel said that he, therefore, asked to speak with the two employees present.

Ms. Stevens told him that she had conducted her rounds at 10:30 p.m. and that she had gone into the victim's room and found her sleeping. Ms. Stevens said that the victim activated the emergency bell at 10:45 p.m., yelling for help. Ms. Stevens said, when she arrived back at the victim's room, she found her bed bloody and the victim sitting on the toilet. Detective Bartel said that Ms. Stevens was calm at the beginning of the interview but, as she described the victim's injuries, she became "very emotional." Detective Bartel said that he attempted to contact Ms. Stevens and Defendant Lee two days later and neither answered their phone or returned his call. He called Ms. Elms and informed her of this, and she told him that both women were required to return to work for an interview. Detective Bartel parked at Sterling House and waited for the women to arrive so he could speak with them.

During that second interview, Ms. Stevens again became emotional, giving him the impression that she was upset about what had happened. Ms. Stevens did not offer any additional information, but she did agree to participate in a more organized interview. Detective Bartel said that Ms. Stevens came for the third interview and did not cooperate with him. Detective Bartel said that, at the conclusion of the third interview, he told Ms. Stevens that she and Defendant Lee were suspects. Detective Bartel then sought and obtained a sealed indictment against Ms. Stevens, along with Defendant Brooks and Defendant Lee. Detective Bartel said that, as his investigation continued, he discovered no information implicating Ms. Stevens, including any indication that she had any contact with Defendant Lee or Defendant Brooks outside of work. Detective Bartel said that he

9

had no evidence that Ms. Stevens was involved in this offense.

Speaking about his interactions with Defendant Lee and his further investigation, Detective Bartel testified that he first interviewed Defendant Lee on the night of the incident at Sterling House. Defendant Lee told him that she thought that the victim had fallen and hit her head. Defendant Lee told the detective that no one had entered the building, and she said that she was folding clothes when the victim called for help. When Defendant Lee posited that the victim had fallen and hit her head on the nightstand, Detective Bartel asked her why there was nothing out of place on the nightstand. The detective said that Defendant Lee's demeanor changed considerably and her voice "became very shaky." He chose not to pursue this line of questioning at the time.

After speaking with Defendant Lee, Detective Bartel went to Gateway Hospital to speak with Dr. Root. When the detective noted the skin tear to the finger upon which the victim wore the ring she claimed had been taken, he deemed her story credible and began his investigation as a theft or robbery rather than a fall case.

Detective Bartel said that, after this incident, he watched databases utilized in law-enforcement, such as online pawning records, to see if the ring appeared. On October 8, 2014, he examined a "drop down box" that said "out-of-state pawns by local residents." He noticed that a 1.5 carat loose diamond had been pawned in Roswell, Georgia, at Meridian Diamond Company by a man named Martavious Brooks. Detective Bartel printed this information, which included that the ring was pawned on October 2, 2014. Detective Bartel said that he had never before heard of Defendant Brooks, but when he searched Defendant Brooks in another database, he learned that Defendant Brooks and Defendant Lee were listed as boyfriend and girlfriend. He later confirmed that they were in fact married.

Detective Bartel testified that he contacted the Roswell Police Department, and officers from that department took possession of the diamond for him. Those officers then sent the diamond to the CPD's evidence locker via FedEx. Detective Bartel took the loose diamond to the store that originally appraised the victim's ring, and he also later had Mr. Teague, the jeweler who originally appraised the ring, examine the diamond.

Detective Bartel said that he next attempted to determine whether Defendant Brooks and Defendant Lee communicated with each other via telephone around or during the time of the alleged assault. The detective obtained Defendant Brooks's phone number from the documentation that Defendant Brooks submitted when he pawned the loose diamond. He subpoenaed their phone records from which he determined that Defendant Brooks and Defendant Lee had communicated via telephone during the time that the alleged assault occurred and had also communicated on the date that Defendant

Brooks sold the diamond in Roswell, Georgia. The day after Defendant Brooks pawned the loose diamond, Defendant Lee called him six times in a row. Based upon this evidence, Detective Bartel contacted the district attorney, who presented the case to the grand jury, and the grand jury returned sealed indictments.

Detective Bartel said that, when he served the indictments on Defendants Lee and Brooks, they were at their apartment together. When Defendant Lee answered the door, Detective Bartel took her into custody. Detective Bartel said he found Defendant Brooks attempting to crawl underneath the bed. He placed them both into custody and transferred them for booking. During the transfer, Defendant Brooks indicated that he purchased the loose diamond from a friend and that he had a receipt for the purchase.

During cross-examination, Detective Bartel agreed that, during the 911 call, Defendant Lee told the operator that the victim said that she had been beaten up. Despite this, the Sterling House employees were still certain that she had fallen. Detective Bartel agreed that he did not see any blood on Defendant Lee on the night of the assault. Detective Bartel testified that Mr. Peterson's description of the ring differed from the appraisal description in that Mr. Peterson described the ring as being set in a gold band, oval cut, and two carats. The appraisal indicated that the ring was round and 1.5 carats.

Detective Bartel agreed that he did not have any recorded conversation between the two defendants and that he also did not have any text messages.

During redirect examination, Detective Bartel testified that, after Mr. Peterson got the appraisal of the ring, he corrected his description of the ring.

Thomas Teague, the man who originally appraised the victim's ring, testified that CPD officers asked him to look at the loose diamond that they retrieved from the Roswell Police Department. Mr. Teague said that he examined the diamond at the CPD and that he did not have his microscope with him but that the diamonds appeared to be consistent with the victim's diamond that he had previous appraised. The carat weight was consistent, and both diamonds were round brilliant cut. Mr. Teague said that a 1.5 round cut diamond was not rare but that, normally, if one was to purchase a larger stone, it would be a 2 or 3 carat stone. He said in his twenty-eight years as a jeweler, he had seen maybe twelve 1.5 carat diamonds such as this one.

During cross-examination, Mr. Teague said that the diamond he appraised was "H" in color, meaning it was "faint" in color. Diamonds that are "N" are very light or light in color. He agreed he could not be certain that the diamond he appraised in 2009 was the same as the one he had looked at recently at the request of the CPD.

11

Hailey Butler, the store manager at McKenzie and Smiley Jewelers, testified that Detective Bartel asked her to appraise the diamond that Defendant Brooks sold. Ms. Butler said that she appraised that diamond's size at 1.48 carats. She said that the diamond was a round brilliant diamond, having an SI 2 in clarity and a K in color. Ms. Butler noted that her appraisal differed from the one done in 2009 in that they estimated the size of the diamond as .02 carats different. She said, however, that this was common depending on the scale or the method of measuring of the diamond. She said that the two appraisals listed the clarity similarly.

Ms. Butler examined the diamond again during the trial. She weighed the diamond, and it weighed 1.49 carats. She compared the diamond in her master stone set to the diamond to determine its color, and she said that under the current lighting and background, the diamond appeared to have an L color. This, she said, was different from the K color rating from the previous appraisal. Ms. Butler said that the diamond had a noticeable inclusion, which was her basis for the SI2 clarity. Ms. Butler said that color was the most subjective marker, in that the color can vary depending on lighting, background, and perception. Ms. Butler testified that the diamond that she examined in court could be the same diamond as the one that had been appraised in 2009.

During cross-examination, Ms. Butler testified that the color H was four colors away from the color L. She confirmed that she still believed that her color grading of L was accurate. She agreed that H was an almost colorless diamond, and she said she would not have classified the diamond she examined in court as colorless. Ms. Butler disagreed that the diamond that she examined in court was necessarily different from the one in the 2009 appraisal, and she said it was more difficult to get an accurate color assessment when the stone was mounted in a ring. Ms. Butler said that the two diamonds had similar qualities and that the color assessment may have been "off" based upon it being mounted at the time of the 2009 appraisal.

During redirect examination, Ms. Butler estimated the value of the diamond to be $9850. She further testified that the value of the setting was approximately $300.

The State rested its case, and the defendants filed a motion for judgment of acquittal. The trial court partially granted the judgment of acquittal. With regard to Defendant Brooks, the trial court dismissed the robbery and burglary charges, finding that the State had offered no proof that Defendant Brooks was in the building at the time of the offense. The trial court allowed the State to proceed on the theft charge against him. With regard to Defendant Lee, the trial court dismissed the burglary charge, and it allowed the State to proceed on the aggravated robbery and theft charges against her.

For the defense, Jimmy Murphy testified that he had been the owner of

Hendersonville Jewelers for twenty-six years and had been in the jewelry business for thirty-five years. He said that he bought, sold, and appraised diamonds, sometimes appraising ten in a month. Mr. Murphy said that he would not confuse an L diamond with an H diamond and further that it would not be reasonable for any jeweler to confuse the two because of the huge difference in color. Mr. Murphy opined that removing the stone from its setting would not make it appear four colors more yellow. Mr. Murphy estimated the value of the stone to be much less than the other two appraisals, saying the value of the diamond could be as little as a couple of thousand dollars.

After deliberation, the jury found Defendant Brooks guilty of the theft of property valued between $10,000 and $60,000, and Defendant Lee guilty of theft of property valued between $10,000 and $60,000 and aggravated robbery. The trial court sentenced Defendant Brooks as a Range II, multiple offender to ten years in prison. The trial court merged Defendant Lee's convictions and sentenced her to nine years in prison, at 85%, for the aggravated robbery conviction.

## II. Analysis

On appeal, Defendant Lee contends that the evidence is insufficient to sustain her convictions and that the trial court improperly limited her cross-examination of a witness. Defendant Brooks contends that the evidence is insufficient to sustain his conviction.

## A.  Sufficiency of Evidence

Defendant Lee contends that the evidence is insufficient to sustain either her aggravated robbery conviction or her theft conviction. About the aggravated robbery conviction, she contends that there was insufficient proof that the victim suffered serious bodily injury. About the theft conviction, she contends that there was insufficient proof that the value of the diamond taken exceeded $10,000. Defendant Brooks contends that there is insufficient evidence to sustain his theft conviction because there was not sufficient proof that the diamond that he sold to Meridian Diamond Company was the same as the diamond taken from the victim, in part because the 2009 appraisal had a color four shades different from the color of the diamond Defendant Brooks sold. The State counters that the proof was sufficient to sustain the convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*,

91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption

of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## 1. Aggravated Robbery

Defendant Lee contends that the evidence is insufficient to sustain her aggravated robbery conviction because there was insufficient proof that the victim suffered serious bodily injury. Robbery, a Class C felony, "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401. Aggravated robbery, is robbery as defined above "[w]here the victim suffers serious bodily injury." Aggravated robbery is a Class B felony. "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2). "Serious bodily injury" means bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member or organ. T.C.A. § 39-11-106(a)(34). This court has stated the following about the term "serious bodily injury" in the context of assault:

> While the phrase "serious bodily injury" . . . is not susceptible to precise legal definition, it must describe an injury of a greater and more serious character than that involved in a simple assault. The distinction between "bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law.

*State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997).

Our supreme court discussed serious bodily injury in *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012). In that case, the facts included that the victim had been shot in the leg during a robbery. He did not realize that he had been shot until he sat down on a bench, and an ambulance arrived to transport him to the hospital shortly thereafter. *Id.* at 100. At the hospital, the victim described his pain as mild to moderate, a doctor cleaned the wound and took x-rays but did not stitch it, and the victim left the hospital hours after arriving. *Id.* The court concluded that the victim's injuries did not constitute serious bodily injury. In so doing, it held:

> Factor (B) was not established because there was no evidence that Westbrooks'[s] injury involved any loss of consciousness, much less a protracted loss of consciousness. Factor (C) was not shown because there was no proof that Westbrooks suffered extreme physical pain. Admitting to

the difficulty of quantifying physical pain in *State v. Sims,* 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995) our Court of Criminal Appeals applied the ejusdem generis canon of statutory construction, stating that "the enumerated portions of the definition of serious bodily injury should be read as coming from the same class of injuries." The *Sims* court concluded that the pain associated with the injury suffered by the victim in that case— a broken nose—is not extreme enough to be included in a class of injury that involves a substantial risk of death, protracted unconsciousness, permanent disfigurement or protracted loss, or substantial impairment of a function of a bodily member, organ, or mental faculty. Likewise, in the instant case, the evidence does not support a finding that Westbrooks's injury involved a degree of pain that would warrant its inclusion among the other enumerated portions of the definition of "serious bodily injury." Although Westbrooks testified that he experienced pain after realizing he had been shot, hospital records do not classify his pain as "extreme" but rather as "mild" to "moderate." Westbrooks was given a prescription for pain medication before leaving the hospital, but he never testified as to the degree of pain he experienced. A jury could not reasonably infer from Westbrooks's testimony, the hospital records, and the nature of his injury that Westbrooks's wound involved extreme pain. Factors (D) and (E) were not established because nothing in Westbrooks's testimony supports an inference that his injury involved protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. Westbrooks did not testify that he suffered any disfigurement, loss or impairment, and to the contrary, stated that as of the time of trial, he had no problems with the leg. This brings us to the remaining factor, factor (A), which provides that a bodily "injury that involves . . . a substantial risk of death" also qualifies as a serious bodily injury. Tenn. Code Ann. § 39-11-106(a)(34).

The Court of Criminal Appeals in a two-to-one decision ruled that the State presented evidence that would allow a rational jury to find that Westbrooks's injury involved a substantial risk of death, reasoning that although there was no actual serious bodily injury, the bullet could easily have punctured or severed the victim's femoral artery or vein, causing the victim to bleed to death. The fact that the bullet somehow traveled entirely through the victim's thigh while missing all of the vital blood vessels contained therein is a serendipitous turn of events for the victim, not the defendants.

*Farmer,* 2011 WL 2672008, at *5.

16

We respectfully disagree with this analysis. The statute provides that a serious bodily injury is an "*injury that involves* . . . substantial risk of death." Tenn. Code Ann. § 39-11-106(a)(34)(A) (emphasis added). By the plain meaning of this language, we hold that in determining whether there was a "serious bodily injury" based on a "substantial risk of death," we must look to the injury that occurred rather than the injury that *could* have occurred or the manner in which it occurred.

*State v. Farmer*, 380 S.W.3d 96, 101-102 (Tenn. 2012) (footnote omitted).

In *Sims*, mentioned in the *Farmer* decision, the victim was struck in the face with a pistol one time. *Id.* at 48. As a result, she had a broken and swollen nose, a bruised cheekbone, two black eyes, and a cut across the bridge of her nose. *Id.* She testified that she experienced extreme physical pain on her face and nose. *Id.* During a hospital visit that lasted approximately two hours, a doctor treated the victim with a surgical band-aid to close the laceration, and she was not prescribed pain medication. *Id.* at 49. The victim also testified that she consulted a plastic surgeon about the cut on her face, but she did not undergo plastic surgery. *Id.* at 48. She missed five weeks of work because of her injuries. *Id.* Construing the meaning of "extreme physical pain" in light of the other statutory factors that constitute serious bodily injury, this court stated, "We do not believe that the pain commonly associated with a broken nose is extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." *Id.* at 49. Although this court acknowledged "the difficulty of quantifying or measuring pain," we concluded that the evidence was insufficient to support the element of serious bodily injury based on extreme physical pain or protracted or obvious disfigurement. *Id.* at 49-50.

The question we turn to decide then is whether a jury could reasonably conclude that the victim's injuries involved a substantial risk of death or extreme physical pain or protracted or obvious disfigurement. The victim testified that she was ninety years old when someone came into her room, attacked her by punching her repeatedly in the face and smothering her with a pillow, and ripped a ring off of her finger. The treating physician testified that the victim suffered a fracture to her orbital floor and her orbital bone was depressed almost a centimer.

We conclude that this disfigurement constitutes an obvious disfigurement within the meaning of the statute. There was also sufficient evidence of the victim being in extreme physical pain. The victim, elderly, and bleeding from her face called for help and expressed her pain at the time of the attack. The treating physician testified that the

victim was "very bruised," had "a lot of facial trauma," and was "very uncomfortable and in pain." The repeated blows to the victim's face clearly caused her extreme physical pain.

We also conclude that a reasonable jury could have found that the victim's injuries here involved a substantial risk of death. The victim was on multiple medications at the time of the assault, including two medications that thinned her blood to prevent blood clotting. Following the assault, the victim's doctor admitted her into the hospital to monitor for intracranial bleeding, which the doctor testified was a possibility given the victim's medical history and age. Her doctor also admitted the victim into the hospital to repeat a CT scan to check for delayed brain bleeding, a potentially fatal condition.

It has long been a stated principle that criminal defendants must take their victims as they find them. *Odeneal v. State*, 157 S.W. 419, 421 (Tenn.1913) ("One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause."). In this case, we conclude that as a result of this attack the victim suffered a serious bodily injury involving a substantial risk of death. At the time she was attacked, the victim was ninety years of age and was on multiple medications, including blood thinners, for multiple ailments. As a result of her injuries, the treating physician admitted the victim into the hospital because the physician feared that the victim might suffer a fatal injury as a result of delayed brain bleeding. The physical injury to the victim's eye, which included a fracture of the orbital bone, involved a substantial risk of death from cranial bleeding.

In both *Sims* and *Farmer* the victims were treated at the hospital briefly and then released. In both *Sims* and *Farmer* the victims were relatively young and otherwise healthy. In both of those cases a doctor did not testify that the victims were admitted to be monitored for a potentially fatal resulting injury. We distinguish the injuries of the *Sims* and *Farmer* victims from the injuries to the victim in this case and conclude that a reasonable jury could have found that the victim's injuries here involved a substantial risk of death from cranial bleeding. Defendant Lee is not entitled to relief on this issue.

### 2. Theft

About the theft conviction, Defendant Lee contends that there was insufficient proof that the value of the diamond taken exceeded $10,000. Defendant Brooks also contests the proof supporting the valuation of the diamond and also contends that there was insufficient proof that the diamond he sold to Meridian Diamond Company was the same diamond taken from the victim, in part because the 2009 appraisal had a color four shades different from the color of the diamond Defendant Brooks sold.

18

The jury convicted the defendants of theft of property valued at $10,000 or more but less than $60,000. This crime requires a jury to find the following elements beyond a reasonable doubt: (1) that the defendant knowingly obtained or exercised control over property owned by another; (2) that the defendant did not have the owner's effective consent; and (3) that the defendant intended to deprive the owner of the property. T.C.A § 39-14-109 (2014). Theft of property is a Class C felony if the value of the property obtained is $10,000 or more but less than $60,000. T.C.A. § 39-14-105(3) (2014).

In this case, in the light most favorable to the State, the State proved that Defendant Lee entered the victim's room, assaulted her, and took her diamond ring. She communicated repeatedly via telephone with Defendant Brooks, her husband, during the time of the assault. Four days after the assault, Defendant Brooks took a diamond, out of state to sell, and it weighed the same and had similar characteristics as the one Defendant Lee had stolen. Defendant Lee and Defendant Brooks communicated repeatedly via telephone around the time of the sale. Expert appraisers appraised the diamond as having a value of $9,850 and the ring setting as having a value of $300, for a total of $10,150. While the defendants offered contradictory testimony that the value of the diamond was less, it was within the jury's province to determine that the value of the diamond ring was $10,000 or more.

Further, with regard to Defendant Brooks's contention that the State did not prove the diamonds were the same because of the color difference between the 2009 appraisal and the in-court appraisal, one of the State's experts testified that the color of a diamond appraised while it was in a setting can appear different than a loose diamond. She testified that the 2009 appraisal was done while the diamond was set. The State's expert testified that the diamonds could be the same. Based upon this testimony and the circumstantial evidence, which included that Defendant Brooks sold a diamond of the same weight four days after it was taken from the victim, the jury rationally concluded that the diamond from the victim's ring was the same diamond that Defendant Brooks sold to Meridian Diamond Company. As previously stated, "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379. As such, the defendants are not entitled to relief on this issue.

## B. Cross-Examination

Defendant Lee contends that the trial court improperly limited her cross-examination of Jackie Stevens, who was the other employee present during the robbery. During the trial, Defendant Lee's counsel asked Ms. Stevens, who had originally been charged as a co-defendant, if police told her that she was subject to receiving twenty

years in prison if she were found guilty of "elder abuse." Ms. Stevens responded that she remembered the officer telling her that she was subject to jail time but did not remember him saying exactly twenty years. Defendant Lee's counsel sought to impeach Ms. Stevens by introducing the portion of the recorded interview during which the officer informed Ms. Stevens that she could receive twenty years if found guilty.

The State objected, contending that, pursuant to statute, the attorneys were not permitted to comment at any time on possible penalties for the offense charged, citing Tennessee Code Annotated section 40-35-201(b). The trial court took the matter under advisement and later found that any mention of sentencing would be prohibited.

The interview itself is not included in the record. Defendant Lee's counsel did not attempt to refresh Ms. Stevens's recollection, made no offer of proof through Ms. Stevens, and did not question Detective Bartel about the matter. The record before us contains no evidence that Detective Bartel made this statement during the interview at all.

Generally speaking, a denial of the right to an effective cross-examination is "constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial." *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980). The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court. *Coffee v. State*, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948); *Davis v. State*, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts may not disturb limits on cross-examination except when there has been an unreasonable restriction on the right. *State v. Fowler*, 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963); *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. *State v. Goad*, 707 S.W.2d 846, 852-53 (Tenn. 1986). If Defendant Lee had evidence that Detective Bartel informed Ms. Stevens that she faced a punishment of twenty years and Defendant Lee thought that evidence was admissible, it was incumbent upon Defendant Lee to make an offer of proof of that statement. Before an appellate court can rule upon an issue predicated upon the exclusion of evidence, the evidence excluded must appear in the record. *State v. Robinson*, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1997) (citing Tenn. R. Evid. 103(a)(2); *Goad*, 707 S.W.2d at 853; *Alley v. State*, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994); Tennessee Law of Evidence § 103.4) If the evidence is not contained in the record, the appellate court will not consider the issue. *Alley*, 882 S.W.2d at 815; *State v. Lane*, 689 S.W.2d 202, 205 (Tenn. Crim. App. 1984), *perm. app. denied* (Tenn. 1985); *State v. Byerley*, 658 S.W.2d 134, 139 (Tenn. Crim. App. 1983), *perm. app. denied* (Tenn. 1983). Defendant Lee is not entitled to relief on this issue.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE